**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| MARY PAYNE, ASHLEY JORDAN, JOSEPH FOSCHI, and KELVIN MONROE, on behalf of themselves, and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>FULL HOUSE RESORTS, INC.,<br><br>Defendant. | Case No.: 2:25-cv-02314-APG-MDC<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Mary Payne, Ashley Jordan, Joseph Foschi, and Kelvin Monroe, on behalf of themselves, and all others similarly situated ("Plaintiffs"), allege the following against Defendant, Full House Resorts, Inc. ("Defendant" or "Full House") based on personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents, as to all other matters:

## I. INTRODUCTION

1. Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard Plaintiffs' and other similarly situated Defendant's customers' and employees' sensitive information, including full names and Social Security numbers ("Personally Identifiable Information" or "PII").

2. Defendant owns and operates casinos and related hospitality and entertainment facilities throughout the United States.[1]

3. Upon information and belief, former and current customers and employees of

[1] https://fullhouseresorts.com/ (last acc. Jan. 8, 2026).

Defendant are required to entrust Full House with sensitive, non-public PII, without which Defendant could not perform its regular business activities, in order to obtain services from Full House, including tax reporting of gambling winnings. Defendant retains this information for at least many years and even after the consumer relationship has ended.

4. By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5. On July 23, 2025, Defendant learned that one of its IT support vendors had been penetrated by a cyberattack ("Data Breach").[2] In response, Defendant launched an investigation to determine the nature of the Data Breach[3], concluding that Plaintiffs' and Class Members' PII was compromised in the Data Breach between July 22 and 23, 2025.[4]

6. According to the letter ("Notice Letter") Defendant sent to Plaintiffs and Class Members, the compromised PII includes, at a minimum, Plaintiffs' and other Full House customers' and employees' names and Social Security numbers.[5]

7. Defendant failed to adequately protect Plaintiffs' and Class Members' PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions and their utter failure to protect customers' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk to victims of the Data Breach will remain for their

---

[2] *See* Notice Letter(s) to Plaintiffs, collectively attached as Exhibits A-D.
[3] Ex. A.
[4] *Id.*
[5] *Id.*

respective lifetimes.

8. Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

9. Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures and ensure those measures were followed by its IT vendors to ensure that the PII of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party.

10. Plaintiffs and Class Members have a continuing interest in ensuring their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

11. Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) fraudulent misuse of the PII disclosed in the Data Breach; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for

unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

12. Plaintiffs and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## II. PARTIES

13. Plaintiff Mary Payne is, and at all times mentioned herein was, an individual citizen and resident of Port Gibson, Mississippi, where she intends to remain.

14. Plaintiff Ashley Jordan is, and at all times mentioned herein was, an individual citizen and resident of Milan, Indiana, where she intends to remain.

15. Plaintiff Joseph Foschi is, and at all times mentioned herein was, an individual citizen and resident of Crescent City, Illinois, where he intends to remain.

16. Plaintiff Kelvin Monroe is, and at all times mentioned herein was, an individual citizen and resident of Biloxi, Mississippi, where he intends to remain.

17. Defendant is a Delaware corporation with its principal place of business located at 1800 Festival Plaza Drive, Suite 680, Las Vegas, Nevada 89135.

## III. JURISDICTION AND VENUE

18. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, many of whom reside outside the state of Nevada and have different citizenship from Defendant, including Plaintiffs. Thus, minimal

diversity exists under 28 U.S.C. §1332(d)(2)(A).

19. This Court has general personal jurisdiction over Defendant because Defendant operates its principal place of business in this District.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant has harmed Class Members residing in this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendant's Business

21. Defendant operates casinos and other entertainment facilities throughout the United States.

22. According to Full House, it is "[b]ased in Las Vegas, [and] operates seven casino facilities in Illinois, Mississippi, Indiana, Nevada, and Colorado. Each of our gaming properties reflects a unique atmosphere custom-designed for each regional market."[6]

23. Plaintiffs and Class Members are current and former customers of Defendant.

24. As a condition of receiving gambling awards, products and/or services, Defendant requires that its customers, including Plaintiffs and Class Members, entrust it with highly sensitive personal information.

25. The information held by Defendant in its computer systems or those of its vendors at the time of the Data Breach included the unencrypted PII of Plaintiffs and Class Members.

26. Upon information and belief, Defendant made promises and representations to its customers, including Plaintiffs and Class Members, that the PII collected from them as a condition

[6] https://fullhouseresorts.com/ (last acc. Jan. 8, 2026)

of visiting with Defendant would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

27. For example, Full House maintains a Privacy Policy that is posted on its website, in which it promises to "…make every effort to protect, as stated in our internal controls and standard operating procedures, all personal sensitive information about our casino patrons."[7]

28. Plaintiffs and Class Members provided their PII to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

29. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

30. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of its IT vendors and affiliates. Defendant has a legal duty to keep consumer's PII safe and confidential.

31. Defendant had obligations created by the Federal Trade Commission Act ("FTC Act"), contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

---

[7] *See Full House Resorts, Inc. Privacy Policy*, last updated April 12, 2024, avail. at https://fullhouseresorts.com/full-house-resorts-privacy-policy-and-terms-of-use/ (last acc. Jan. 8, 2026).

32. Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

33. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

**B. The Data Breach**

34. On or about November 14, 2025, Defendant sent Plaintiffs a Notice Letter, which states:

> **<u>What Happened?</u>**
>
> On July 23, 2025, we identified unauthorized access to Silver Slipper Casino Hotel's network. Upon identifying this unauthorized access, we immediately took steps to secure the network, notified law enforcement, and launched an investigation with the assistance of cybersecurity professionals. The investigation determined that unauthorized access occurred between July 22 and 23, 2025. The investigation identified files that were accessed without authorization and those files were reviewed for personal information. On October 14, 2025, we determined that your personal information was included in one or more of the files. Defendant Entertainment ("Defendant") recently identified suspicious activity in its IT network resulting from a social engineering attack on an outside IT support vendor used by the Company.
>
> **<u>What Information Was Involved?</u>**
>
> The information included your name in combination with your Social Security number.[8]

35. Omitted from the Notice Letter are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and

[8] Ex. A-D

Class Members, who retain a vested interest in ensuring that their PII remains protected.

36. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

37. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed. Moreover, Defendant failed to exercise due diligence in selecting its IT vendors or deciding with whom it would share sensitive PII.

38. The attacker accessed and acquired files Defendant shared with a third party containing unencrypted PII of Plaintiffs and Class Members, including their Social Security numbers and other sensitive information. Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

39. Plaintiffs further believe their PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type. Moreover, following the Data Breach, Plaintiffs have experienced fraudulent charges as well as suspicious spam communications in an attempt to secure additional PII from them, manifesting the fraudulent misuse of the PII stolen in the Data Breach due to Full House's negligence and breach of contractual obligations.

**C. Defendant Acquires, Collects, and Stores Plaintiffs' and the Class's PII.**

40. As a condition of utilizing Defendant's gambling services, Plaintiffs and Class Members were required to give their sensitive and confidential PII to Defendant.

41. Defendant retains and stores this information and derives a substantial economic benefit from the PII that they collect. But-for the collection of Plaintiffs' and Class Members' PII, Defendant would be unable to perform its services.

42. By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

43. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

44. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiffs and Class Members or by exercising due diligence in selecting its IT vendors and properly auditing those vendor's security practices.

45. Upon information and belief, Defendant made promises to Plaintiffs and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

46. As stated prior, Defendant maintains a Privacy Policy that is posted on its website ("Privacy Policy")[9] in which Full House states:

> Generally, we do not collect information that personally identifies individuals except when individuals knowingly and voluntarily provide such information to us. Personal information is information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly

[9] *See Full House Resorts, Inc. Privacy Policy*, last updated April 12, 2024, avail. at https://fullhouseresorts.com/full-house-resorts-privacy-policy-and-terms-of-use/ (last acc. Jan. 8, 2026).

> or indirectly, with a particular individual or household.
>
> Examples of means in which we collect data include (but are not limited to): when individuals submit comments, questions or requests for information to us through the website, patron comment cards, promotional prize records, reservations, social media information, RSVPs, surveys, registration with our Resorts player reward clubs, applications for credit and information gathered for government required reporting.[10]

47. Therein, Full House expressly promises to protect the PII it receives from customers, stating:

> **Privacy Principles**
>
> 1. We make every effort to protect, as stated in our internal controls and standard operating procedures, all personal sensitive information about our casino patrons.
> 2. We conduct business using physical, electronic, and organizational controls to protect sensitive information.
> 3. We limit access to this information to only authorized employees and vendors and require that any vendor, organization, or individual that provides products and/or services on our behalf protects the confidentiality of this information.
> 4. The protection of sensitive information is exercised for former casino patrons, as well as existing casino patrons.[11]

48. Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

### D. Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of PII Are Particularly Suspectable to Cyber Attacks.

49. Defendant’s data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the breach.

50. Data thieves regularly target companies like Defendant's due to the highly

[10] *Id.*
[11] *Id.*

sensitive information in their custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

51. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[12] The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.[13] The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[14] These numbers held steady in 2024. In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year. [15]

52. In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

53. Additionally, as companies became more dependent on computer systems to run

---

[12] *See* Identity Theft Resource Center, *2023 Data Breach Annual Report* (Jan. 2024); https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.
[13] *Id.*
[14] *Id.*
[15] *2024 Data Breach Report*, ITRC (Identity Theft Resource Center) (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last accessed Jan. 8, 2026).

their business,[16] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[17]

54. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

55. As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiffs and Class members, and of the foreseeable consequences if its data security systems, or those of its vendors, were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

56. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

57. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

58. Defendant was, or should have been, fully aware of the unique type and the

[16] U.S. Fed. Res., *Implications of Cyber Risk for Financial Stability*, FEDS NOTES (May 12, 2022) https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last acc. Jan. 8, 2026).

[17] Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022* (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last acc. Jan. 8, 2026).

significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

59. In the Notice Letter, Defendant offers to cover identity monitoring services for a period of 12 months. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs and Class Members' PII. Moreover, once this service expires, Plaintiffs and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

60. Defendant's offer of credit and identity monitoring establishes that Plaintiffs' and Class Members' sensitive PII *was* in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

61. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

62. The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long-lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

63. As a corporation in possession of its customers' and former customers' PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a

result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

**E. Value of Personally Identifiable Information**

64. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

65. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

66. For example, PII can be sold at a price ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

67. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data

---

[18] 17 C.F.R. § 248.201 (2013).

[19] *Id.*

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last acc. Jan 9, 2026).

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last acc. Jan. 9, 2026).

[22] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last acc. Jan. 9, 2026).

breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

68. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[23]

69. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

70. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

### F. Defendant Failed to Comply with FTC Guidelines.

71. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need

---

[23] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last acc. Jan. 9, 2026).

[24] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last acc. Jan. 9, 2026).

for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

72. In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

73. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

74. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify

the measures businesses must take to meet their data security obligations.

75. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

76. Defendant was at all times fully aware of its obligation to protect the PII of its customers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**G. Defendant Failed to Comply with Industry Standards.**

77. As noted above, experts studying cybersecurity routinely identify institutions as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

78. Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

79. Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and

training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

80. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

81. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**H. Defendant Breached Its Duty to Safeguard Plaintiffs' and Class Members' PII.**

82. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Class Members

83. Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect customers' PII;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

e. Failing to sufficiently train its employees and vendors regarding the proper handling of its customers PII;

f. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTC Act;

g. Failing to adhere to industry standards for cybersecurity as discussed above; and

h. Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' PII.

84. Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' PII by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted PII.

85. Had Defendant remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential PII.

**I. Common Injuries & Damages**

86. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) fraudulent misuse of the PII disclosed in the Data Breach; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

**J. The Data Breach Increases Victims' Risk of Identity Theft.**

87. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come.

88. The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

89. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the

data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

90. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

91. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

92. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[25]

[25] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last acc. Jan. 9, 2026).

93. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

94. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

95. The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiffs and the other Class Members.

96. Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

97. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**K. Loss Of Time to Mitigate Risk of Identity Theft and Fraud**

98. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual

to greater financial harm—yet, the resource and asset of time has been lost.

99. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and resecuring their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

100. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[26]

101. These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[27]

102. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[28]

---

[26] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[27] *See* FTC, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last acc. Jan. 9, 2026).

[28] Jason Steele, "Credit Card and ID Theft Statistics," Oct. 24, 2017, https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last acc. Jan. 9, 2026).




103. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[29]

**L. Diminution in Value of PII**

104. PII is a valuable property right.[30] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

---

[29] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/ new.items/d07737.pdf (last acc. Jan. 8, 2026) ("GAO Report").

[30] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

105. An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[31]

106. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[32,33]

107. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[34]

108. Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[35]

109. As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

110. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[31] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last acc. Jan. 9, 2026).
[32] https://datacoup.com/ (last acc. Jan. 9, 2026).
[33] https://digi.me/what-is-digime/ (last acc. Jan. 9, 2026).
[34] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last acc. Jan. 9, 2026).
[35] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last acc. Jan. 9, 2026).

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

111. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

112. The fraudulent activity resulting from the Data Breach may not come to light for years.

113. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

114. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

115. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

**M. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary.**

116. Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity

theft crimes—*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

117. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

118. Consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

119. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

**N. Loss of the Benefit of the Bargain**

120. Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for products and/or services, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**O. Plaintiffs' Experiences**

***i. Plaintiff Mary Payne***

121. Plaintiff Mary Payne ("Plaintiff Payne") was a customer of Defendant.

122. In order to gamble at Defendant's casino, Plaintiff Payne was required to provide her PII to Defendant, including her name and Social Security number.

123. At the time of the Data Breach—on or before July 23, 2025—Defendant retained Plaintiff Payne's PII in its system.

124. Plaintiff Payne is very careful about sharing her sensitive PII. Plaintiff Payne stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Payne would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

125. Plaintiff Payne viewed the Notice Letter sent to her by Defendant (Ex. A). According to the Notice Letter, Plaintiff Payne's PII was improperly accessed and obtained by unauthorized third parties, including her name and Social Security number.

126. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Payne made reasonable efforts to mitigate the impact of the Data Breach, including changing passwords and resecuring her own computer network; and checking her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Payne has spent significant time dealing with the Data Breach—valuable time Plaintiff Payne otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

127. Plaintiff Payne suffered actual injury from having her PII compromised as a result

of the Data Breach including, but not limited to: (i) lost or diminished value of her PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

128. Plaintiff Payne further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach and only began following the Data Breach.

129. The Data Breach has caused Plaintiff Payne to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

130. As a result of the Data Breach, Plaintiff Payne anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

131. As a result of the Data Breach, Plaintiff Payne is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

132. Plaintiff Payne has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***ii. Plaintiff Ashley Jordan***

133. Plaintiff Ashley Jordan ("Plaintiff Jordan") was an employee of Defendant at Full

House's Rising Star Casino in Rising Sun, Indiana, from October 2022 to October 2024.

134. As a condition of employment at Defendant's casino, Plaintiff Jordan was required to provide her PII to Defendant, including her name and Social Security number.

135. At the time of the Data Breach—on or before July 23, 2025—Defendant retained Plaintiff Jordan's PII in its system.

136. Plaintiff Jordan is very careful about sharing her sensitive PII. Plaintiff Jordan stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Jordan would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

137. Plaintiff Jordan viewed the Notice Letter sent to her by Defendant, dated November 14, 2025 (Ex. B). According to the Notice Letter, Plaintiff Jordan's PII was improperly accessed and obtained by unauthorized third parties, including her name and Social Security number.

138. Following the Data Breach, Plaintiff Jordan experienced fraudulent misuse of the PII exposed therein, when in mid-November 2025, she incurred a $105.00 fraudulent charge to the same Civista Bank account she used to receive payments from Full House. These monies have not yet been reimbursed.

139. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Jordan made reasonable efforts to mitigate the impact of the Data Breach, approximating nine and a half (9.5) hours. Plaintiff Jordan's efforts include contacting Civista Bank through its mobile application, but was advised that no action could be taken until the charge posted. Despite these efforts, the fraudulent charge remains pending to this day and that she has been unable to

remedy the situation as a result. As such, Plaintiff Jordan has spent significant time dealing with the Data Breach—valuable time Plaintiff Jordan otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

140. Plaintiff Jordan suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) fraudulent misuse of the PII disclosed in the Data Breach; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

141. Plaintiff Jordan further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach and only began following the Data Breach. Indeed, Plaintiff Jordan has consistently received more than one hundred (100) spam emails and calls per week, including emails from GrabAGun.com, fake Medicare and Medicaid inquiries, calls from individuals claiming to be police officers and threatening arrest if she did not provide her Social Security number, inquiries from debt collectors regarding debts she did not incur, and notices claiming she owed unpaid taxes. This spam is directed to the same email address and telephone number that Plaintiff Jordan provided to Full House as a condition of her employment.

142. The Data Breach has caused Plaintiff Jordan to suffer fear, anxiety, and stress,

which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

143. As a result of the Data Breach, Plaintiff Jordan anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

144. As a result of the Data Breach, Plaintiff Jordan is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

145. Plaintiff Jordan has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***iii. Plaintiff Joseph Foschi***

146. Plaintiff Joseph Foschi ("Plaintiff Foschi") is a former employee of Defendant, who had completed licensing and employment applications in the care of the company, from February 2023 to April 2024, approximately.

147. As a condition of employment with Full House, Plaintiff Foschi was required to provide his PII to Defendant, including his name and Social Security number.

148. At the time of the Data Breach—on or before July 23, 2025—Defendant retained Plaintiff Foschi's PII in its system.

149. Plaintiff Foschi is very careful about sharing his sensitive PII. Plaintiff Foschi stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Foschi would not have entrusted his PII to Defendant had she known of Defendant's lax data security policies.

150. Plaintiff Foschi viewed the Notice Letter sent to him by Defendant, received on or about November 21, 2025 (Ex. C). According to the Notice Letter, Plaintiff Foschi's PII was improperly accessed and obtained by unauthorized third parties, including his name and Social Security number.

151. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Foschi made reasonable efforts to mitigate the impact of the Data Breach, of approximately twelve (12) hours, including contacting Defendant to ascertain what PII was disclosed in the Data Breach beyond his Social Security Number; and checking his financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Foschi has spent significant time dealing with the Data Breach—valuable time Plaintiff Foschi otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

152. Further, sometime in December 2025, Plaintiff Foschi experienced a fraudulent attempt by a cybercriminal to change his online banking and email password.

153. Plaintiff Foschi suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) fraudulent misuse of the PII disclosed in the Data Breach, as shown by the attempt to change his password; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect

the PII.

154. Plaintiff Foschi further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach and only began following the Data Breach.

155. The Data Breach has caused Plaintiff Foschi to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

156. As a result of the Data Breach, Plaintiff Foschi anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

157. As a result of the Data Breach, Plaintiff Foschi is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

158. Plaintiff Foschi has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***iv. Plaintiff Kelvin Monroe***

159. Plaintiff Kelvin Monroe ("Plaintiff Monroe") a former customer of Defendant.

160. In order to gamble at Defendant's casino, Plaintiff Monroe was required to provide his PII to Defendant, including his name and Social Security number.

161. At the time of the Data Breach—on or before July 23, 2025—Defendant retained Plaintiff Monroe's PII in its system.

162. Plaintiff Monroe is very careful about sharing his sensitive PII. Plaintiff Monroe stores any documents containing his PII in a safe and secure location. He has never knowingly

transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Monroe would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

163. Plaintiff Monroe viewed the Notice Letter sent to him by Defendant, dated November 14, 2025 (Ex. D). According to the Notice Letter, Plaintiff Monroe's PII was improperly accessed and obtained by unauthorized third parties, including his name and Social Security number.

164. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Monroe made reasonable efforts to mitigate the impact of the Data Breach, including changing passwords and resecuring his own computer network; and checking his financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Monroe has spent significant time dealing with the Data Breach—valuable time Plaintiff Monroe otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

165. Plaintiff Monroe suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of his PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

166. Plaintiff Monroe further suffered actual injury in the form of experiencing an

increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach and only began following the Data Breach.

167. The Data Breach has caused Plaintiff Monroe to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

168. As a result of the Data Breach, Plaintiff Monroe anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

169. As a result of the Data Breach, Plaintiff Monroe is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

170. Plaintiff Monroe has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

171. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

172. Specifically, Plaintiffs propose the following class definition, subject to amendment as appropriate:

> **All individuals in the United States whose PII was disclosed in the Data Breach in July 2025 and received a Notice Letter from Defendant (the "Class").**

173. Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom

this case is assigned as well as their judicial staff and immediate family members.

174. Plaintiffs reserve the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

175. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

176. Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiffs believe that the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

177. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant's conduct violated the FTC Act;

c. When Defendant learned of the Data Breach;

d. Whether Defendant's response to the Data Breach was adequate;

e. Whether Defendant unlawfully shared, lost, or disclosed Plaintiffs' and Class Members' PII;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

g. Whether Defendant's data security systems prior to and during the Data

Breach complied with applicable data security laws and regulations;

h. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether Defendant owed a duty to Class Members to safeguard their PII;

j. Whether Defendant breached its duty to Class Members to safeguard their PII;

k. Whether hackers obtained Class Members' PII via the Data Breach;

l. Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

o. What damages Plaintiffs and Class Members suffered as a result of Defendant's misconduct;

p. Whether Defendant's conduct was negligent;

q. Whether Defendant was unjustly enriched;

r. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

s. Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the

establishment of a constructive trust.

178. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

179. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel are competent and experienced in litigating class actions, including data privacy litigation of this kind.

180. Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

181. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

182. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

183. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Breach by Defendant.

## VI. CLAIMS FOR RELIEF

### <u>COUNT I</u>
### NEGLIGENCE AND NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

184. Plaintiffs restate and reallege the preceding paragraphs 1 through 183 as if fully set forth herein.

185. Defendant requires its customers and employees, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing its services and/or as a condition of employment with Full House.

186. Defendant gathered and stored the PII of Plaintiffs and Class Members as part of its business of soliciting customers, which solicitations and services affect commerce, and in the course of employing Plaintiffs and the Class.

187. Plaintiffs and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

188. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

189. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to exercise due diligence in selecting IT vendors and to audit, monitor, and ensure the integrity of its vendors' systems and practices and to give prompt notice to those affected in the case of a data breach.

190. Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

191. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

192. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of being customers of Defendant.

193. Defendant's duty to use reasonable care in protecting confidential data arose not

only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

194. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

195. Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

196. Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

197. Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

198. Defendant breached its duties, pursuant to the FTC Act and other applicable standards, including industry standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to audit, monitor, or ensure the integrity of its vendors' data security practices;

d. Allowing unauthorized access to Class Members' PII;

e. Failing to detect in a timely manner that Class Members' PII had been compromised;

f. Failing to remove former customers' PII it was no longer required to retain pursuant to regulations; and

g. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

199. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

200. Plaintiffs and Class Members were within the class of persons the FTC Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm this statute is intended to guard against.

201. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

202. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

203. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

204. It was foreseeable that Defendant's failure to use reasonable measures to protect

Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

205. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed.

206. Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

207. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

208. Plaintiffs and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

209. Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

210. Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

211. Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost

and disclosed to unauthorized third persons as a result of the Data Breach.

212. But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

213. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

214. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) fraudulent misuse of the PII disclosed in the Data Breach, including resulting in monetary damages; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

215. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

216. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs

and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

217. Plaintiffs and Class Members are entitled to actual, compensatory and consequential damages suffered as a result of the Data Breach which occurred due to Defendant's tortious misconduct.

218. Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiffs and Class Members in an unsafe and insecure manner.

219. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiffs and the Class)

220. Plaintiffs restate and reallege the preceding paragraphs 1 through 183 as if fully set forth herein.

221. Plaintiffs and Class Members were required to provide their PII to Defendant as a condition of receiving services and gambling with Defendant, or as a condition of employment with Defendant.

222. Plaintiffs and the Class entrusted their PII to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and

accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

223. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

224. Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

225. The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

226. Defendant solicited, offered, and invited—and indeed required—Plaintiffs and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

227. In accepting the PII of Plaintiffs and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

228. On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

229. Indeed, as stated prior, Defendant maintains a Privacy Policy that is posted on its website, in which it promises to "…make every effort to protect, as stated in our internal controls and standard operating procedures, all personal sensitive information about our casino patrons."[36]

230. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

231. Plaintiffs and Class Members paid money and provided their PII to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

232. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

233. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

234. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

235. Defendant breached the implied contracts it entered into with Plaintiffs and the Class by failing to safeguard and protect their PII, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

236. As a direct and proximate result of Defendant's breach of the implied contracts,

---

[36] *See Full House Resorts, Inc. Privacy Policy*, last updated April 12, 2024, avail. at https://fullhouseresorts.com/full-house-resorts-privacy-policy-and-terms-of-use/ (last acc. Jan. 8, 2026).

Plaintiffs and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

237. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

238. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

239. Plaintiffs restate and reallege the preceding paragraphs 1 through 183 as if fully set forth herein.

240. This count is pleaded in the alternative to the Breach of Implied Contract claim above (Count II).

241. Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they paid for services from Defendant and/or provided their labor to Defendant, as well as by providing Defendant with their valuable PII. In exchange, Plaintiffs and Class Members should have received from Defendant the services that were the subject of the transaction and should have had their PII protected with adequate data security.

242. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes.

243. Defendant failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

244. Defendant acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

245. If Plaintiffs and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII to Defendant.

246. Plaintiffs and Class Members have no adequate remedy at law.

247. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

248. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) fraudulent misuse of the PII disclosed in the Data Breach, including resulting in monetary damages; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

249. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by

establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

250. Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, Mary Payne, Ashley Jordan, Joseph Foschi, and Kelvin Monroe, on behalf of themselves, and all others similarly situated, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B. For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

C. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

D. For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data

collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

v. prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that

if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and securing checks;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested,

and updated;

xiv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

E. For an award of punitive damages, as allowable by law;

F. For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G. Pre- and post-judgment interest on any amounts awarded; and

H. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: January 12, 2026

*/s/ Andrew E. Mize*
Andrew E. Mize*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203

(615) 254-8801
amize@stranchlaw.com

Daniel Srourian (*Pro Hac Vice* forthcoming)
**SROURIAN LAW FIRM, P.C**.
468 N. Camden Drive, Suite 200
Beverly Hills, California 90210
(213) 474-3800
(213) 471-4160 (facsimile)
daniel@slfla.com

Kristen Lake Cardoso*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
(954) 525-4100
cardoso@kolawyers.com

Mariya Weekes*
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, Florida 33131
(866) 252-0878
mweekes@milberg.com

Leanna A. Loginov*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, Florida 33132
(305) 479-2299
lloginov@shamisgentile.com

**Pro Hac Vice*

***Interim Class Counsel***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of January, 2026, the foregoing document was filed with the Clerk of the Court using the Court's CM/ECF filing system, which will serve on all counsel of record.

*/s/ Andrew E. Mize*
Andrew E. Mize